IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-58

Filed 5 August 2026

Cumberland County, No. 21 CRS 052989-250

STATE OF NORTH CAROLINA,

v.

DAVID BERNARD LOFTON, JR., Defendant.

Appeal by Defendant from judgment entered 18 April 2024 by Judge Regina M. Joe in Cumberland County Superior Court. Heard in the Court of Appeals 12 August 2025.

*Attorney General Jeff Jackson, by Assistant Attorney General Miranda S. Holley, for the State.*

*Richard J. Costanza for defendant-appellant.*

STADING, Judge.

David Bernard Lofton, Jr. ("Defendant") appeals from final judgment after the trial court sentenced him for assault on a female and instructed the jury on the flight doctrine. Defendant contends the trial court lacked jurisdiction to impose judgment on the assault on a female conviction because the State voluntarily dismissed that charge prior to sentencing, and further argues the trial court erred by instructing the jury on flight in the absence of evidentiary support. For the reasons below, we hold the trial court did not err.

## I. Background

On 7 April 2021, Defendant was arrested for first-degree burglary, first-degree kidnapping, and assault on a female. On 8 August 2023, a grand jury returned a true bill of indictment charging Defendant with first-degree burglary, second-degree kidnapping, assault with a deadly weapon with intent to kill, assault inflicting physical injury by strangulation, and assault on a female. Defendant was also indicted separately as an habitual felon.

The evidence tended to show that Kayla Mitchell and Defendant were dating for about four months. Ms. Mitchell and Defendant both worked at Burger King, and Defendant would help watch Ms. Mitchell's two children while she worked her shifts. Ms. Mitchell's two children were five and six years old. Though Defendant had previously stayed nights with Ms. Mitchell, he did not live with her.

On 6 April 2021, Ms. Mitchell decided to take her two children with Defendant to Myrtle Beach. While at the beach, Defendant shoplifted items in front of Ms. Mitchell and her children. Ms. Mitchell testified she did not appreciate his conduct in front of her children. Defendant's actions led to an argument between him and Ms. Mitchell while driving back from the beach. During the car ride, Defendant became upset and "verbally abusive" to Ms. Mitchell in front of her children. Ms. Mitchell reported feeling scared. Eventually, Defendant told Ms. Mitchell he had people who could pick him up and that she should let him out of the car. Ms. Mitchell

thought this was the best decision to make as a mother and to deescalate the situation.

Ms. Mitchell let Defendant out of her vehicle and proceeded to drive her and her children back to their residence. Defendant called and sent messages to Ms. Mitchell for her to come back and get him, but she did not feel safe doing so. After returning to her residence around 9:00 p.m., Ms. Mitchell put her kids to bed before trying to get some sleep.

While lying in her bed, Ms. Mitchell began hearing tapping sounds from her window and noticed Defendant outside of her residence. Defendant was having conversations with himself and told Ms. Mitchell that he was going to come in and hurt her. Defendant proceeded to hit Ms. Mitchell's window hard enough for her to think the window was about to break. A few moments later, Ms. Mitchell heard Defendant kicking her door while she was still in her room. Eventually, Ms. Mitchell heard "a final bang where her [front door] snapped open." Upon entering the residence, Defendant made his way to Ms. Mitchell's bedroom and began screaming at her. Defendant fought with Ms. Mitchell and eventually grabbed a knife from the bedroom and made stabbing motions, stating he was "ready to risk it all and he didn't care what happened." Ms. Mitchell was able to get the knife out of Defendant's hand, but the fight continued until Defendant pinned Ms. Mitchell down on her bed such that she was unable to breathe.

Ms. Mitchell had already called the police, but she did not have time to speak with the operator before the attack. Ms. Mitchell was able to escape from Defendant and ran outside where she saw an officer parked nearby. Officer William Cannon of the Hope Mills Police Department testified that he responded to a call from Ms. Mitchell's residence as the operator could only hear a woman screaming. When Officer Cannon arrived, he saw Ms. Mitchell running towards his patrol car. Ms. Mitchell pointed out Defendant to Officer Cannon, and, from about fifty yards away, he saw Defendant running away while wearing all dark clothing. Officer Cannon followed in search of Defendant. In doing so, Officer Cannon searched the back fence line to Ms. Mitchell's apartment building but could not find Defendant. Officer Cannon then convened with Sergeant Rolland at his patrol car and was provided with a picture of Defendant.

Officer Cannon returned to his vehicle and drove to a nearby shopping center, about 150 to 200 yards behind Ms. Mitchell's apartment complex. Officer Cannon saw Defendant, but this time he was wearing a white tank top rather than the dark clothing he had on before. After initially giving a false name to the officers, Defendant was arrested.

On 26 February 2024, Defendant's case proceeded to trial. Defendant left during jury selection and did not return for the remainder of the trial. The jury found Defendant guilty of second-degree kidnapping and assault on a female. The jury

acquitted Defendant of the remaining three offenses. The following colloquy took place outside the jury's presence after Defendant was found guilty:

> Prosecutor: Yes, Your Honor. The State does not believe it can proceed on the habitual felon at this time.
>
> . . . .
>
> The Court: The Court's intention at this point, you will be filing a dismissal on the habitual indictment?
>
> . . . .
>
> The Court: So you're just asking that the matter be held open and that --
>
> Prosecutor: Be held open.
>
> The Court: -- the Court not specifically --
>
> Prosecutor: Not specifically use the word "PJC" because PJC by statute can only be one year and then continued for an additional year. I would certainly hope the defendant is picked up --
>
> . . . .
>
> The Court: You're basically asking to hold the matter in abeyance?
>
> Prosecutor: Yes, Your Honor. So in this particular case, the defendant left during jury selection. The Court issued an order for arrest and just left judgment open until such time as the defendant was picked up.
>
> . . . .
>
> Defense Counsel: I mean, if the Court's going to hold it open, I don't -- whether you say it's open or whether you PJC, if it looks like a duck, walks like a duck, it's a duck.
>
> The Court: It must be a duck. All right. Well, I mean, if

we got a duck on one hand and a duck on the other, I'm not going to use the word PJC. I'm going to hold the matter open until such time that the defendant is arrested and brought before the Court for sentencing.

On 1 March 2024, the prosecutor filed a voluntary dismissal on form AOC-CR-307B. On side one of the dismissal, the only offense listed was Defendant's habitual felon charge with the State noting there was "insufficient evidence to proceed with trial by jury." Additionally, a box was checked stating "See Additional File Numbers And Offenses on Side Two." On side two of the dismissal, under "additional file numbers and offenses," the habitual felon and assault on female offenses were listed.

Defendant eventually turned himself in, which led to his formal sentencing. On 18 April 2024, Defendant was sentenced to 33 to 52 months for the second-degree kidnapping conviction, and 150 days for the assault on a female conviction, to run consecutively. Defendant entered an oral notice of appeal in open court.

## II. Analysis

Defendant first contends that the trial court lacked jurisdiction to sentence him for the assault on a female charge since the prosecutor voluntarily dismissed the charge after his conviction, but before he was sentenced. Defendant also argues the trial court erred by instructing the jury on the flight doctrine. We take each in turn.

### A. Trial Court's Jurisdiction

The issue is whether the trial court was divested of jurisdiction to sentence Defendant for an offense that the prosecution voluntarily dismissed after conviction

but before sentencing. Here, Defendant was found guilty of assault on a female, but before sentencing, the prosecution included that charge on the back of the voluntary dismissal form. After careful review, we conclude that after a charge becomes a conviction, a prosecutor is without authority to dismiss that offense. Accordingly, the trial court did not err by sentencing Defendant on the charges for which he was convicted by the jury.

Issues of the trial court's jurisdiction are questions of law subject to de novo review. *See State v. Lebeau*, 271 N.C. App. 111, 113, 843 S.E.2d 317, 319 (2020). "The term jurisdiction refers to a court's power to decide a case or issue a decree. Such power is granted by the people who speak through their constitutions and statutes, not by an indictment drafted by a prosecutor." *State v. Singleton*, 386 N.C. 183, 196, 900 S.E.2d 802, 812 (2024) (citations and internal quotations omitted). That said, "[i]t is the allegation of criminal conduct . . . that activates a court's jurisdiction[.]" *Id*. at 199, 900 S.E.2d at 814 (citation omitted).

Generally, however, "a prosecutor has the authority and discretion to dismiss charges against a defendant at any stage of the proceedings." *State v. Murphy*, 193 N.C. App. 236, 238, 666 S.E.2d 880, 883 (2008). Procedurally, a prosecutor "may dismiss an indictment under either N.C.G.S. § 15A-931 or § 15A-932." *State v. Lamb*, 321 N.C. 633, 641, 365 S.E.2d 600, 604 (1988). A dismissal under section 15A-931 is a "simple and final dismissal which terminates the criminal proceedings under that indictment." *Id*. Meanwhile, "[s]ection 15A-932 provides for a dismissal 'with leave'

when the defendant fails to appear and cannot be readily found." *Id.* Under section

15A-932, a "dismissal results in removal of the case from the court's docket, but the

criminal proceeding under the indictment is not terminated. All outstanding process

retains its validity and the prosecutor may reinstitute the proceedings by filing

written notice with the clerk without the necessity of a new indictment." *Id.*

In this case, the following colloquy took place between the prosecution and the

trial court:

> Prosecutor: No, Your Honor. The State will not be proceeding with habitual felon phase so if you want to -- I'm not certain how the Court wishes to proceed at this juncture, but the State --
>
> The Court: But do you have authority to still dismiss ones with the gun?
>
> Prosecutor: Yes, Your Honor.
>
> The Court: Is that what you're doing?
>
> Prosecutor: Yes, Your Honor. The State does not believe it can proceed on the habitual felon at this time.
>
> The Court: All right.

The prosecution dismissed the habitual felon charge by making an "oral

dismissal in open court before or during the trial." N.C. Gen. Stat. § 15A-931(a)

(2025). In addition to the oral motion, however, the prosecution filed dismissal form

AOC-CR-307B with the trial court, including the assault on a female offense along

with the habitual felon offense. Form AOC-CR-307B allows the State to enter a

dismissal, a dismissal with leave, or a notice of reinstatement for a case that had

previously been dismissed with leave.  Additionally, the State checked the "other" box for its reason under the dismissal section and stated, "insufficient evidence to proceed with trial by jury."  Then, the State checked the box for "See Additional File Numbers And Offenses on Side Two."  On side two, the State listed the assault on a female and habitual felon as additional offenses.

The State argues the transcript and the reinstatement section of the dismissal form show that the trial court only intended to dismiss with leave the habitual felon offense.  *But see*, *e.g.*, *State v. Ford,* No. COA17-817, 259 N.C. App. 733, 813 S.E.2d 478, 2018 WL 2209133, at *5 (2018) (BERGER, J., concurring) (unpublished).  ("The prosecutor unnecessarily filed a written dismissal that was not accurate. It is the prosecutor's duty alone to make the record reflect what took place in open court.").  On the dismissal form, the "with leave" box was left unchecked.  *See Lamb*, 321 N.C. at 641, 365 S.E.2d at 604 ("Section 15A-932 provides for a dismissal 'with leave' when the defendant fails to appear and cannot be readily found[,] [which] results in removal of the case from the court's docket, but the criminal proceeding under the indictment is not terminated.").  Consequently, both Defendant's habitual felon and assault on a female charges were voluntarily dismissed pursuant to N.C. Gen. Stat. § 15A-931, not N.C. Gen. Stat. § 15A-932.

Turning to the statute itself, subsection 15A-931(a), provides:

> Except as provided in G.S. 20-138.4, *the prosecutor may dismiss any charges stated in a criminal pleading including those deferred for prosecution by entering an oral*

> *dismissal in open court before or during the trial, or by
> filing a written dismissal with the clerk at any time.* The
> clerk must record the dismissal entered by the prosecutor
> and note in the case file whether a jury has been impaneled
> or evidence has been introduced.

N.C. Gen. Stat. § 15A-931(a) (emphasis added). Crucially, "the specific language in the statute authoriz[es] entry of a dismissal before a trial, during a trial, or *at any time.*" *State v. Courtney*, 372 N.C. 458, 473, 831 S.E.2d 260, 271 (2019).

In addressing whether the trial court had jurisdiction to sentence Defendant for the assault on a female offense after it was dismissed, we must first resolve whether the prosecutor had authority to dismiss that offense after conviction. In doing so, we consider Defendant's argument under *State v. Oakes* that the prosecutor was able to dismiss the offense since the prosecutorial process was not yet completed. 113 N.C. App. 332, 339, 438 S.E.2d 477, 481 (1994) (relying on *State v. Allen*, 292 N.C. 431, 436, 233 S.E.2d 585, 588 (1977)) (suggesting that a charge is "prosecuted to completion" upon "entry of judgment or sentence."); *see generally* N.C. Gen. Stat. § 15A-101 (4a) (2025) ("Judgment is entered when sentence is pronounced. Prayer for judgment continued upon payment of costs, without more, does not constitute the entry of judgment.").

While recognizing that "[t]he sentencing phase of a criminal prosecution constitutes a significant component of the prosecutorial process," *Oakes*, 113 N.C. App. at 339, 438 S.E.2d at 481, we cannot simply gloss over the differences between a "charge" and "conviction" for purposes of N.C. Gen. Stat. § 15A-931(a). Under

subsection 15A-931(a), the prosecutor has the discretion to "dismiss *any charges* stated in a criminal pleading . . . by entering an oral dismissal in open court before or during the trial, or by filing a written dismissal with the clerk *at any time*."  N.C. Gen. Stat. § 15A-931(a) (emphasis added).  While dismissing a charge is one thing, a prosecutor's dismissal of a conviction is another, which may raise constitutional concerns.  *State ex rel. Com'r of Ins. v. N. Carolina Fire Ins. Rating Bureau*, 291 N.C. 55, 70, 229 S.E.2d 268, 276 (1976) ("When reasonably possible, a statute . . . should be construed so as to avoid serious doubt as to its constitutionality.").

We therefore turn to whether, under section 15A-931, a prosecutor may dismiss an offense after conviction.  Specifically, we look to the words "charge" and "conviction" for purposes of N.C. Gen. Stat. § 15A-931(a).  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (1st ed. 2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.").  While Chapter 15A does not statutorily define these words, "in keeping with our well-established principles of statutory interpretation," we conclude that the terms "charge" and "conviction" are unambiguous words "that '[have] a definite and well known sense in the law.' "  *State v. Lebedev*, 291 N.C. App. 274, 277, 895 S.E.2d 455, 457–58 (2023) (quoting *Fid. Bank v. N.C. Dep't of Revenue*, 370 N.C. 10, 19, 803 S.E.2d 142, 148 (2017)).  "In the event that the General Assembly uses an unambiguous word without providing an explicit

statutory definition, that word will be accorded its plain meaning." *Id.* (quoting *Fid. Bank*, 370 N.C. at 19, 803 S.E.2d at 149).

The plain meaning of "charge" is "[a] formal accusation of an offense as a preliminary step to prosecution[.]" *Charge*, BLACK'S LAW DICTIONARY (12th ed. 2024). Meanwhile, "conviction" means "[t]he act or process of judicially finding someone guilty of a crime; the state of having been proved guilty . . . [t]he judgment (as by a jury verdict) that a person is guilty of a crime." *Conviction*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Convict*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("To prove or officially announce (a criminal defendant) to be guilty of a crime after proceedings in a law court; specif[ically], to find (a person) guilty of a criminal offense upon a criminal trial[.]"). Taken together, for present purposes, it follows that a "charge," which is a "formal accusation," ceases to be such upon conviction, *i.e.*, being judicially found and proven guilty. *See id.* From here, it follows that, under section 15A-931, a prosecutor loses the ability to dismiss a charge once a jury renders its verdict and the charge results in a conviction. *See generally Murphy*, 193 N.C. App. at 239, 666 S.E.2d at 883 (2008) (emphasis added) ("We hold the [prosecutor] has the authority and discretion to withdraw an habitual felon indictment as to some or all of the underlying felony charges pending against a defendant, *up until the time that the jury returns a verdict of guilty* that defendant had attained the status of an habitual felon."). Put differently, under section 15A-931, a prosecutor loses the ability to dismiss a charge when it ceases to be such and turns into a conviction. *See id.*; *but*

*see State v. Bell*, 156 N.C. App. 350, 356, 576 S.E.2d 695, 699 (2003) (quoting *State v. Patterson*, 332 N.C. 409, 421, 420 S.E.2d 98, 105 (1992)) (emphasis added) ("Our Supreme Court has characterized dismissal with leave [under section 15A-932] as a 'procedural calendaring device.' ").

Moreover, while unnecessary given the unambiguous nature of section 15A-931, the plain and ordinary meaning of the statutory language is confirmed by context. *See State v. Jones*, 305 N.C. 520, 531, 290 S.E.2d 675, 681 (1982). While subsection 15A-931(a) states that a prosecutor can "fil[e] a written dismissal with the clerk at any time," N.C. Gen. Stat. § 15A-931(a), we do not read statutory provisions in isolation. *In re J.E.B.*, 376 N.C. 629, 634, 853 S.E.2d 424, 429 (2021) (citations and internal quotations omitted) ("[T]his Court does not read segments of a statute in isolation. We similarly do not read portions of a sentence in isolation."). Instead, we "consider the statute as a whole and determine its meaning by reading it in its proper context[.]" *City of Asheville v. Frost*, 370 N.C. 590, 592, 811 S.E.2d 560, 562 (2018); *see also* Antonin Scalia, *A Matter of Interpretation* 37 (1997) ("In textual interpretation, context is everything.").

Here, subsection 15A-931(a) "authoriz[es] entry of a dismissal before a *trial*, during a *trial*, or *at any time*." *Courtney*, 372 N.C. at 473, 831 S.E.2d at 271 (emphasis added). The statute's inclusion of the word "trial" in multiple instances immediately preceding "at any time" is telling. Reading the statute contextually, we conclude that "at any time," while on its face broad, is best understood to refer to "at any time

- 13 -

throughout the trial," *i.e.*, up until the end of trial. *See generally Jeffries v. Cnty. of Harnett*, 259 N.C. App. 473, 493, 817 S.E.2d 36, 50 (2018) (quoting *City of Winston v. Beeson*, 135 N.C. 271, 47 S.E. 457, 460 (1904)) ("The interpretative canon of *noscitur a sociis* instructs that 'associated words explain and limit each other' and an ambiguous or vague term 'may be made clear and specific by considering the company in which it is found, and the meaning of the terms which are associated with it.' "); *see also Happel v. Guilford Cnty. Bd. of Educ.*, 387 N.C. 186, 209, 913 S.E.2d 174, 193 (2025) (citations and internal quotations omitted) ("The above reasoning aligns with a pair of related canons of statutory construction. First, *noscitur a sociis* provides that a word is better understood by considering the meanings of neighboring words. And second, *ejusdem generis* provides that a general or collective term at the end of a list of specific items is typically controlled and defined by reference to the specific classes that precede it."). Further, we conclude that the term "trial," as used in subsection 15A-931(a), does not encompass sentencing. *See generally State v. Oliver*, 309 N.C. 326, 360, 307 S.E.2d 304, 326 (1983) ("During the guilt phase of a trial, the focus is on guilt versus innocence. . . . However, during sentencing, . . . [t]he emphasis is on the circumstances of the crime and the character of the criminal."). In other words, for subsection 15A-931(a), the "trial" concludes after the jury renders its verdict. *See Trial*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A formal judicial examination of evidence and determination of legal claims in an adversary proceeding."); *cf. Bifurcated Trial*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A trial that is divided

into two stages, such as for guilt and punishment or for liability and damages."); *see also Oakes*, 113 N.C. App. at 339, 438 S.E.2d at 481. ("The sentencing phase of a criminal prosecution constitutes a significant component of the prosecutorial process").

Furthermore, under subsection 15A-931(a), common sense dictates that "any time" cannot extend indefinitely. *See Rhyne v. K-Mart Corp.*, 358 N.C. 160, 189, 594 S.E.2d 1, 20 (2004) (citation modified) ("Courts normally adopt an interpretation which will avoid absurd or bizarre consequences, the presumption being that the legislature acted in accordance with reason and common sense[.]") If that were the case, the logical extreme would produce absurd results. *See id*; *see also Jackson v. Home Depot U.S.A., Inc.*, 388 N.C. 109, 116, 919 S.E.2d 199, 205 (2025) (citations and internal quotations omitted) ("To be sure, we can reject the plain reading of a statute if that interpretation would lead to absurd results.). To illustrate this principle, consider a hypothetical where a Defendant is convicted, remains incarcerated for twenty-five years, after which the prosecutor then dismisses the underlying offense given the language of "at any time" under subsection 15A-931(a). This can neither be the law nor the legislature's intent. *See id*.

Indeed, our interpretation comports with our system of government. With respect to prosecutors, our North Carolina Constitution provides they shall "be responsible for the prosecution on behalf of the State of all criminal actions in the Superior Courts of [their] district, . . . and perform such other duties as the General

Assembly may prescribe." N.C. Const. art. IV, § 18; *see also* N.C. Gen. Stat. § 7A-61 (2025). "The clear mandate of that provision is that the responsibility and authority to prosecute all criminal actions in the superior courts is vested solely in the several District Attorneys of the State." *State v. Camacho*, 329 N.C. 589, 593, 406 S.E.2d 868, 871 (1991); *see also State v. Diaz-Tomas*, 382 N.C. 640, 646, 888 S.E.2d 368, 374 (2022) ("[T]he North Carolina Constitution's grant of exclusive authority to the state's district attorneys regard[s] the prompt handling, scheduling, and disposition of criminal charges."). That said, no law has been cited, and our review has yielded none, supporting the proposition that a prosecutor has the authority to set aside a jury verdict. If that were so, a post-conviction dismissal would be tantamount to a prosecutor having the authority to unilaterally vacate a conviction.

Such a position would also flagrantly ignore the importance of juries in our system of government. At our ratifying convention, a North Carolina judge proclaimed that:

> Juries are called the bulwarks of our rights and liberty; and no country can ever be enslaved as long as those cases which affect their lives and property are to be decided, in a great measure, by the consent of twelve honest, disinterested men, taken from the respectable body of yeomanry. It is highly improper that any clause which regards the security of the trial by jury should be any way doubtful.

4 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 108 (Jonathan Elliot ed., 2d ed. 1891).

Moreover, as we celebrate the 250th anniversary of our founding, it seems most appropriate to underscore that "when the English continued to try Americans without juries, the Founders cited the practice as a justification for severing our ties to England." *Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109, 121, 144 S. Ct. 2117, 2128 (2024) (citing THE DECLARATION OF INDEPENDENCE para. 20 (U.S. 1776)). In this vein, the Supreme Court has remarked that juries are "of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right has always been and should be scrutinized with the utmost care." *Id.* (citation modified). We either respect the roles our juries serve or we do not. *See Ring v. Arizona*, 536 U.S. 584, 612, 122 S. Ct. 2428, 2445 (2002) (SCALIA, J., concurring). For these reasons, and under the facts before us, we cannot hold that a prosecutor has the authority to dismiss an offense after a jury has already returned a guilty verdict. As discussed, to hold otherwise would allow a prosecutor to unilaterally vacate a conviction while undermining the important role our juries serve. Here, we decline to relegate the jury's verdict to a mere formality that could be single-handedly unwound by a prosecutor's change of heart or inadvertence.

At this juncture, it is appropriate to acknowledge the holding of *Courtney*. In that case, the defendant's trial for murder resulted in a mistrial due to a hung jury. *Courtney*, 372 N.C. at 458, 831 S.E.2d at 260. Afterwards, the trial court continued the case for the State to decide whether it would re-try the defendant; however, the State ultimately voluntarily dismissed the murder charge by filing dismissal form

- 17 -

AOC-CR-307 with the trial court. *Id*. at 460, 831 S.E.2d at 263. After new evidence emerged, the defendant was retried six years later. *Id*. at 459, 831 S.E.2d at 262.

In response to the Defendant's double jeopardy argument, the Court held that "when the State enters a voluntary dismissal under N.C.G.S. § 15A-931 after jeopardy has attached, jeopardy is terminated in the defendant's favor, regardless of the reason the State gives for entering the dismissal." *Id*. at 459, 831 S.E.2d at 263. The Court reasoned that the State's dismissal of a charge under section 15A-931 is "tantamount to an acquittal, making it a jeopardy-terminating event for double jeopardy purposes." *Id*. at 471, 831 S.E.2d at 270. The Court further reasoned that the legislature contemplated for the State to enter a dismissal "sometime other than during the middle of a trial," given that the language of section 15A-931 authorizes dismissal "before a trial, during a trial, or *at any time*." *Id*. at 473, 831 S.E.2d at 271 (emphasis in original).

The present case materially differs from *Courtney* both substantively and procedurally. Unlike *Courtney*, which resulted in a mistrial due to a hung jury, this case resulted in a conviction. Indeed, *Courtney* dealt with a dismissal after the jury was unable to render a verdict; whereas here, dismissal was sought after the jury returned a guilty verdict. Further, *Courtney* was primarily focused on, for double jeopardy purposes, whether a dismissal was a "jeopardy-terminating event" after a mistrial under a continuing-jeopardy theory. Meanwhile, here, we are solely concerned with whether a prosecutor can dismiss an offense after the jury renders a

verdict and, if so, whether a trial court is divested of jurisdiction over sentencing. *See, e.g., Singleton*, 386 N.C. at 200, 900 S.E.2d at 815. For these reasons, *Courtney* is inapposite to our narrow consideration of whether, under section 15A-931, a prosecutor can dismiss an offense after conviction, and whether Defendant may be sentenced for an offense purportedly dismissed after the jury rendered its verdict.

We conclude the trial court did not err by sentencing Defendant upon his eventual return after the jury had convicted him.

## B.   Flight Doctrine

Defendant next argues the trial court erred by instructing the jury on the flight doctrine. Defendant contends, because of this error, both the second-degree kidnapping conviction and assault on a female conviction should be vacated and a new trial should be granted. At trial, Defendant objected to the flight doctrine jury instruction. *See* N.C. R. App. P. 10(a)(1). Our review leads us to conclude that the trial court did not commit error by instructing the jury on the flight doctrine.

"It is well established that [arguments] challenging the trial court's decisions regarding jury instructions are reviewed de novo by this Court." *State v. Lewis*, 243 N.C. App. 757, 759, 779 S.E.2d 147, 148 (2015) (citation and quotation marks omitted) (brackets in original).

> On appeal, this Court considers a jury charge contextually and in its entirety. The charge will be held to be sufficient if it presents the law of the case in such manner as to leave no reasonable cause to believe the jury was misled or misinformed. The party asserting error bears the burden of

showing that the jury was misled or that the verdict was affected by an omitted instruction. Under such a standard of review, it is not enough for the appealing party to show that error occurred in the jury instructions; rather, it must be demonstrated that such error was likely, in light of the entire charge, to mislead the jury.

*State v. Bettis*, 206 N.C. App. 721, 727, 698 S.E.2d 507, 511–12 (2010) (citation omitted). "[J]ury instructions relating to the issue of flight are proper as long as there is some evidence in the record reasonably supporting the theory that the defendant fled after the commission of the crime charged." *State v. Allen*, 346 N.C. 731, 741, 488 S.E.2d 188, 193 (1997) (citation and quotation marks omitted).

The trial court gave the following instruction to the jury concerning the flight doctrine in accordance with N.C.P.I. - Crim. 104.35:

> The State contends that the defendant fled. Evidence of flight may be considered by you together with all other facts and circumstances in this case in determining whether the combined circumstances amount to an admission or show a consciousness of guilt. However, proof of this circumstance is not sufficient in itself to establish the defendant's guilt.

Defendant urges this Court to grant him a new trial as was done in *State v. Campos*. 248 N.C. App. 393, 789 S.E.2d 492 (2016). In *Campos*, the defendant was arrested and ultimately convicted of intentional child abuse resulting in serious physical injury to his infant daughter. *Id.* at 393, 789 S.E.2d at 493. Over the defendant's objection, the trial court gave a flight instruction allowing the jury to consider the defendant's movements and failure to voluntarily appear at a Sheriff's

Office as "an admission or show of a consciousness of guilt." *Id.* at 396, 789 S.E.2d at 495. On the same day the infant was brought to the hospital, at around 10:00 p.m., an investigator asked the defendant if he would voluntarily meet at the Sheriff's Office to discuss events leading to the infant's injuries. *Id.* at 395, 789 S.E.2d at 494. While initially agreeing, the defendant later chose not to appear at the Sheriff's Office. *Id.* The defendant was arrested ten days later at a hotel located in his own county. *Id.* The defendant and his partner booked a room at the hotel to ensure his partner's arrival for her unrelated court date the following day. *Id.*

In that case, this Court noted there were no attempts to search for the defendant between his initial encounter with the investigator and his arrest. *Id.* at 398, 789 S.E.2d at 496. Further, the defendant was completely within his rights to decline the investigator's offer for him to talk at the Sheriff's Office. *Id.* This Court held "the State failed to enter into evidence any fact reasonably supporting a theory of flight, but instead relied on defendant's decision not to speak with [the investigator] on the night of 1 April as exemplary of flight." *Id.*

Unlike *Campos*, here there is sufficient evidence to support an instruction regarding Defendant's flight. Ms. Mitchell approached and immediately alerted Officer Cannon of Defendant. Officer Cannon testified, as Ms. Mitchell pointed out Defendant, "approximately 50 yards ahead of me there was a subject running away from my direction wearing all dark clothing." Officer Cannon's initial search for Defendant came to an end when the path Defendant took went over a fence located

in the back of Ms. Mitchell's apartment complex. Further, at the time of arrest, Defendant was found approximately 150 to 200 yards behind Ms. Mitchell's apartment complex, wearing a white tank top rather than all dark clothing he was initially wearing.

There is sufficient circumstantial evidence that Defendant: was the subject initially pointed out by Ms. Mitchell; took a path which required him to jump a fence; and discarded clothing in between the time he was spotted by Officer Cannon and his eventual arrest. This evidence, even if circumstantial, sufficiently supports the trial court's decision to include the flight doctrine in the jury instructions. *See Bettis*, 206 N.C. App. at 728, 698 S.E.2d at 512 (citation omitted) ("The law makes no distinction between the weight to be given to either direct or circumstantial evidence.").

We hold the trial court did not err by instructing the jury on the flight doctrine.

### III. Conclusion

For these reasons, we hold the trial court did not err by sentencing Defendant for the assault on a female conviction since the dismissal was ineffective and the trial court continued to have jurisdiction. Likewise, we find no error in the trial court's decision to instruct the jury on the flight doctrine.

NO ERROR.

Judges GORE and GRIFFIN concur.